Good morning, Your Honors. Martin Guajardo on behalf of Bhupinder Singh. Mr. Guajardo. After reviewing what would be the entire record, the transcripts and everything that went on before the immigration judge, I think that substantial evidence here compels a different decision than what we received from the immigration judge. I had occasion not too long ago to watch a program on the evening news program, where they interviewed young men that had been wounded in the war in Iraq and they came back without limbs and so forth. They were going through some type of rehabilitation program, and they asked them, some up in the east, northeast, some up down in Alabama in the southern states and so forth, and they asked them if they understood what they were fighting for, what they were there, what Al-Qaeda was all about and things like this. And it was surprising that many of them could not give you, could not respond in a way other than, you know, we're there because we're Americans and we're there because, you know, it's the right thing. I assume you're going to connect this up to this case, Mr. Guajardo. I think so, Judge, because, you know, here we read through this transcript and you see that there's three arrests. There's a 95 arrest. There's a 97 arrest. There's a 98 arrest. And the immigration judge, at one point, he's asking the Respondent, who's a farmer, he's asking him, do you understand the difference between a militant and the militants and the extremists? And part of his decision focuses on the inability of the Respondent, the Petitioner here, but the Respondent before the Immigration Court, to be able to say with any certainty what the group was all about. You know, at one point, what happened at the college campus? There were elections going on, 1995, or even what happened when he was hijacked. He had a very difficult time trying to put across what he understood the group stood for. And it seems to me that the testimony that he did provide to the court, he provided it from his vantage point, from what he saw. He knew that he'd been arrested. He knew that his family paid 25,000 rupees to have him released. And he knew that he was beaten. When he was beaten with the leather straps, when he was hit with the sticks, he knew that happened, and he knew that there was a connection between what he thought was wrong, as far as the group trying to commit fraud in the election in 1995. He knew that was wrong, and he wanted to stand up for that. But the immigration judge, as he heard this testimony, didn't find sufficient detail, didn't find enough coming. Breyer. Its credibility is the issue. And obviously, we're not going to redetermine what the facts are. We have a standard of review which is significantly differential. That is correct. And we're — and I don't — I don't see that the — that the Petitioner today, through me, would be asking that this Court substitute its own judgment. Not at all. But I think that if we look at the evidence and weigh it from the standpoint of what actually happened in that courtroom, it's a lot different being here today in front of three — three judges that have read through these briefs, that have read the arguments, that see these day after day, and being in that room without windows, in front of an immigration judge, everything is very different. And, frankly, if I'm not being disrespectful to the panel, I'd ask that someone at some point actually visit those courtrooms to get an idea of what happens there, because here you have an individual that is told, that his lawyer is told, you don't have to give a closing statement. I don't want a closing argument from you. Take that position that the immigration judge has taken with his attorney and ask yourself, if you were there at the table and you had a lawyer and you're — and the judge that you were in front of looked at your lawyer and said, I don't need to hear from you. I don't need a closing argument. A moment ago with the other case, we — there was some discussion about criminal cases. Imagine having — being in front of the court with a criminal case and your lawyer is told, I don't need to hear from you. I don't need a closing argument. Let's take another part of this. Let's take a look at some of the documents that were presented. Breyer. Well, I would like you to address that, Mr. Guajardo, because it appeared to me that the immigration judge had some concern with the quality of the documentation, the lack of an adequate foundation, the proffer of copies, the suggestion of the use of a fraudulent passport. And I think the judge went to — I read the entire transcript, and I think the judge went to some pains to point out to your client's attorney at the hearing that the immigration judge had some serious concerns with regard to the weight that ought to be given to the testimony for those reasons. And then he also mentioned problems with the hearsay nature of the affidavits that were submitted, the fact that the father did not speak English, as the petitioner testified, and yet signed a declaration in English that was proffered in support at the hearing. Aren't those all proper factors that the finder of fact can take into consideration in judging the credibility of the petitioner and the strength of the evidence that is being submitted in support of his application for asylum? I think they are, Your Honor, and I think they should in every case. But if we take a look at Exhibit A from the excerpts of record, the first document that we have is the notice to appear. Here's the document that's generated by the agency that brings that, the noncitizen, in front of the court. And what is it that they tell us? The first thing, right out of the gate, they check the third box, and the third box says, you have been admitted to the United States but are deportable for the following reasons. The agency themselves, even though it's a fraudulent document, they admitted this individual. They gave him the stamp to not to mean that his admission was lawful. I mean, the asylum, however he got here, and that depends upon his convincing the trier of fact that he has been the victim of persecution and that if he is sent back in the future, that he will continue to be persecuted. That's his burden, right? Unless I've got the case law wrong. It seems to me that if the agency has taken the fraudulent document, they have a choice, they have a choice. They could have treated him as an arriving alien. They didn't. They admitted him. They accepted that document. But we have the trier of fact looking at this and saying, well, you know, it looks to me like you came in here with a bad passport. I don't know that I can believe anything you're saying. But why can't you? Why is that an improper consideration? I mean, we know there's a lot of fraud in immigration cases. We know that there are coyotes and people who make their living professionally smuggling aliens into the United States, and I'm sure these immigration judges see a number of these cases. Why isn't it an appropriate consideration for the fact finder to inquire about the potential for fraud in connection with the case? I think it's an appropriate consideration to have the fact finder inquire about it, but I think it's inappropriate to have someone who should be an impartial fact finder then take that and use it as a stick against you because you've now made an application for asylum. You left that country in any way that you could. If any of us were somewhere where we had been beaten, arrested three times, you're going to find a way to move away from that situation. If it means that you're going to go out and get yourself a fraudulent passport, then maybe that is what the individual does. But does that diminish the credibility? From my vantage point, I don't think so. So fraud could never, in your view of the law, fraud could never be an appropriate factor to assess the credibility of a witness. I think that's going to be the next point. Well, that's certainly not what our jurisprudence says. No. I think that's going too far, Judge. You know, I certainly, certainly, certainly I think that fraud has to be a factor, but I think that if you take all the facts in this case and weigh them, and you look at this and you see the motivation that the individual had for obtaining that fraudulent passport, someone did a photo-altered passport for him, and he used that to enter the United States. Do we take that individual who has been able to make an entry to the United States with that photo-altered passport and then say, well, I don't think I can believe anything you say, notwithstanding that he brings forth a driver's license, a valid driver's license, notwithstanding everything else, and then do we finally conclude in our decision as the impartial fact-finder and say, well, you know, seems to me that we could all have a consistent story that maybe aliens came here and they took us all and you saw the immigration judge. To me, I think that just flies in the face of someone coming to an impartial fact-finder, laying out their story and saying, hey, this is my story for them, even if it wasn't translated, for the attorney to hear that and to be able to go back and say, well, you know, the judge, this is what he said in your case. Thank you. Roberts. Thank you, Mr. Guajardo. You have consumed all your time. We'll now hear from the government. Good morning, Your Honors. May it please the Court. Nora Ascoli-Schwartz for Respondent Alberto Gonzalez. Mr. Guajardo has turned the entire case on its head. There no longer is exclusion or exclusion proceedings. He either could have been turned back at the airport or he had to be admitted to the country on fraudulent documentation. They chose to give him the benefit of the doubt and let him enter and try to make his case. That's the first point. The second point is he has no we don't really know who he is. The immigration judge gave him the benefit of the doubt. He has not one original document establishing his identity, his nationality. We know nothing about who he is. He doesn't have a passport. He doesn't have a driver's license. He doesn't have an original document of any kind. So the immigration judge gave the the immigration inspector at the airport gave him the benefit of the doubt by not summarily excluding him and sending him back on the next flight out. And the immigration judge gave him the benefit of the doubt, accepting that he was who he said he was. He has no proof of who he says he is. But he was given the benefit of the doubt. Moreover, we don't know why he entered why he had to get a fraudulent passport. No charges were pending against him. He's not the simple uneducated farmer counsel represents him to be. He finished high school. He had one year of college. He was active politically in college. So he's not completely naive. He's not a poor farmer who's done nothing but turn the earth and stayed out of politics. So why didn't he go out and try to get his own passport? There was no reason he couldn't try, but he didn't. So we're not sure. This whole the whole adverse credibility here is based on the fact that he just the story doesn't hold water. It's not plausible. He has failed to submit evidence through his testimony which is plausible, credible, and sufficient to sustain his burden of proof, compelling reversal. This whole his whole incident of what happened is his whole claim is based on three incidents. One, he was in a brawl at college. Because it was related to an election, the point is there was violence. People got hurt. Some people got arrested. He was one of them because he was mistreated when he after being arrested doesn't make it persecution on account of a political opinion. It means being mistreated in jail after you're arrested for getting into a physical altercation. And then his testimony about his affiliation with this militant extremist group whom he hung out with while they were retrieving weapons. Now, first of all, why the police would know that he had spent four hours with a militant group is beyond comprehension. Second of all, in his written declaration, he says, they came to take my tractor and took me with them. In his testimony, he didn't say that they took the tractor. They say they took him. And for some reason, he hung around with them. They either talked to him or they didn't talk to him. He said both. And he's hanging around with them for four hours while they're picking up guns and then they let him go. I mean, again, this makes absolutely no sense. He says, well, I agree with their basic policies, but I don't know what they're about. I mean, again, this man has one year of college. He is not uneducated. He must have had some idea. So then apparently the police know that he's been pulled from his field and gone around to other fields and has spent time with the militants. If, in fact, this is true, they know that he's been going around gathering guns from hiding places. Of course the police have a legitimate interest in finding out what this group plans to do with the guns. He was with them when they took the guns. What they did to him in prison, if indeed that happened, is not worth condoning, but it doesn't make it persecution on account of a political opinion that might have been imputed to him. He had information about this group. He was with them when they picked up the guns. The police had a legitimate interest in finding out what this group planned to do with the guns. When he – because he was with them when they picked them up, they had a right to find out what was going on there. Plus, he was released upon payment of a bribe, and that goes to his third arrest. Again, there's no reason why he was picked up. He gives no reason why he was picked up, other than six months later, they came to his house, said to his father, your son's a militant, come with us. And then both were released. He turned himself in for his father, was beaten up for a couple of days, and then was released upon payment of a bribe. Two issues here. One, there's not enough detail, and that was the immigration judge's finding, lack of detail. We don't – this story does not compel a finding that it was persecution on account of an imputed political opinion. Moreover, there are two other plausible explanations. One, that they wanted to know about the activities of this group, which he could reasonably be assumed to have because he hung out with them while they were getting their weapons. Or two, they just wanted money, and the immigration judge found that both were plausible  Because both plausible explanations are possible based on this record, the immigration judge's finding. The evidence cannot be held to compel the finding that this was persecution on account of a statutorily protected ground. Are there any questions on the asylum? Shall we address the motion to reopen? If you wish. Well, there's, again, Mr. Guajardo's term, the proceedings on their heads. He filed a motion to reopen, Petitioner filed a motion to reopen, saying, I'm married now. I want to adjust my status. May I move to reopen? And one of the things an alien must prove in reopening to adjust status is when a marriage is entered into, when the alien is in proceedings, clear and convincing evidence that the marriage is bona fide. He did not do that. He submitted a marriage certificate of a marriage that was consummated in Las Vegas or, I'm sorry, Nevada while immigration proceedings were pending against him. So he had the additional burden of showing that it wasn't entered into for immigration purposes. He made no effort to meet this. So he filed a motion to reconc — when the board denied saying you haven't met your burden, he filed a motion to reconsider. The motion — now, this is where it gets interesting. He didn't — he forgot to file the — send the filing fee. So the board said, we're going to forgive this. We're going to overlook the fact that you forgot to send in your filing fee. We'll give you another 15 days to do it. We're going to extend the deadline for filing. We're going to give you 15 days. Send us the filing fee with an explanation asking us to take it by certification. Does he — and he admits that he got it 10 days before it was due. He got it on August 19th. The board gave him an extra 15 days to August 29th. He didn't do it. He waited a full month. He sent in the money, sent in more documentation, but he didn't send in a request for certification, and he didn't do it within the timeframe set by the board. The board did not have to give him the extra time. He had already missed the deadline, but they did. And now he's saying because the board was not authorized by regulation to give him an additional 15 days, they should be faulted for giving him an additional 15 days. It was his fault for failing — I mean, total failure to meet the additional time that the board gave him. Are there any questions on either issue? No questions from the bench. Counsel, thank you very much. The case just argued will be submitted for decision.
judges: Goodwin, O'scannlain, Tallman